Bruce Allen HATTER, Petitioner,

v.

WARDEN, IOWA MEN'S REFORMATORY, Respondent.

No. C89-0062.

United States District Court, N.D. Iowa, Cedar Rapids Division.

April 17, 1990.

Mark Meyer, Cedar Rapids, Iowa, for petitioner.

Thomas D. McGrane, Asst. Atty. Gen., Des Moines, Iowa, for respondent.

## ORDER

HANSEN, District Judge.

This matter is before the court on petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, filed May 2, 1989, and amended September 29, 1989.

### Prior History

Petitioner was convicted, after his third trial, on June 25, 1986, in the Iowa District Court for Linn County, of kidnapping in the first degree in violation of Iowa Code § 710.2. He was sentenced to life imprisonment without the possibility of parole. He appealed that conviction, raising the same issues raised in this petition,[1] to the Supreme Court of Iowa. This conviction was affirmed. *See State v. Hatter*, 414 N.W.2d 333 (Iowa 1987) (*Hatter III*). Petitioner's first conviction was reversed after a finding that petitioner's arrest had been unlawful due to the arresting officers' failure to obtain an arrest warrant, and because evidence obtained from that arrest should have been suppressed. *See State v. Hatter*, 342 N.W.2d 851 (Iowa 1983) (*Hatter I*). His second conviction was reversed because the trial court abused its discretion in failing to excuse for cause a juror who had been a rape victim. *See State v. Hatter*, 381 N.W.2d 370 (Iowa App.1985) (*Hatter II*).

### Facts

The basic facts of the crime for which petitioner was convicted are not disputed. The primary witness against petitioner was

---

1. Consequently, exhaustion of state remedies is not an issue in this matter. *See* order of Chief Magistrate John A. Jarvey, filed May 31, 1989.

the victim, Deborah. On December 1, 1981, petitioner, age 19, accosted Deborah, age 18 or 19, as she was leaving from a visit with her mother at Harding Junior High School in Cedar Rapids, Iowa. Petitioner's appendix, filed November 1, 1989, at 57–58.[2] He forced her into her car at knifepoint, handcuffed her, and drove her approximately five miles to a secluded rural area. *Id.* at 59–60, 62. There he forced her to perform fellatio upon him. *Id.* at 63. As he attempted to drive away, with the victim still in the car, the vehicle became stuck in a ditch. *Id.* He and Deborah walked down the road to seek assistance, and at some point petitioner removed the handcuffs from Deborah. *Id.* at 64. Deborah testified that while they were walking, it appeared that petitioner was going to stab her with the knife. *Id.* She grabbed his hand and talked him into giving her the knife in exchange for her promise that she would not tell anyone what had happened. *Id.* at 64–65. They flagged down a pickup truck, whose driver helped them get Deborah's car out of the ditch. *Id.* at 65. Deborah hid the knife underneath the floor mat in the back seat of her car. *Id.* at 66–67. Deborah then drove petitioner back to where he had left his car, near Harding Junior High. *Id.* at 67. Deborah and petitioner had attended the same high school, and at some point during the incident Deborah told petitioner that she recognized him. *Id.* at 60–61. Deborah did not immediately report this crime to the authorities. Later that evening she told her father about the incident but omitted the sexual abuse. *Id.* at 72. Her father called a friend whose son, Larry Greco, is a Cedar Rapids, Iowa, police officer. *Id.* at 75 (testimony of Larry Greco). This officer prepared a report based on his conversation with Deborah's father. *Id.* at 73 (testimony of victim), 75–76 (testimony of Larry Greco). Deborah's father disclosed petitioner's identity to Officer Greco, and told Officer Greco that no sexual abuse had occurred. *Id.* at 76 (testimony of Larry Greco). It is unclear from the record whether Deborah ever spoke with Officer Greco. *See id.* at

71. Petitioner was charged with kidnapping in the first degree after making inculpatory statements regarding the incident with Deborah following his arrest for another sexual assault.

Petitioner presents several issues for decision. His arguments are primarily directed at the constitutionality of Iowa's first degree kidnapping statute and the use of his inculpatory statements for impeachment purposes. Petitioner argues that the statute is unconstitutionally vague in violation of the Fifth and Fourteenth Amendments to the United States Constitution and that the punishment imposed upon him, life imprisonment without the possibility of parole, is disproportionate to his crime in violation of the Eighth Amendment prohibition against cruel and unusual punishment. He further argues that his confession should have been suppressed as involuntary.

### Vagueness of Iowa's Kidnapping Statute

Petitioner first argues that Iowa's first degree kidnapping statute, Iowa Code § 710.2, as interpreted by the Supreme Court of Iowa, is unconstitutionally vague and uncertain in its application to the facts of this case in violation of the due process requirements of the Fifth and Fourteenth Amendments to the United States Constitution. Petitioner argues that the dividing line between second degree sexual abuse and first degree kidnapping is too vague to put a reasonable person on notice as to what conduct falls into each category.

The relevant Iowa Code[3] sections are as follows:

> Kidnapping defined. A person commits kidnapping when he or she either confines a person or removes a person from one place to another, knowing that he or she has neither the authority nor the consent of the other to do so; provided, that to constitute kidnapping the act

---

2. Unless otherwise noted, all citations to the appendix are to the testimony of the victim.

3. All citations to the Iowa Code are to the version in effect in 1981, the year in which petitioner's crime was committed.

must be accompanied by one or more of the following:

. . . .

3. The intent to ... subject the person to a sexual abuse.

Iowa Code § 710.1 (1981).

Kidnapping in the first degree. Kidnapping is kidnapping in the first degree when the person kidnapped, as a consequence of the kidnapping, suffers serious injury, or is intentionally subjected to torture or sexual abuse.

Iowa Code § 710.2 (1981).

Sexual abuse defined. Any sex act between persons is sexual abuse by either of the participants when the act is performed with the other participant in any of the following circumstances:

1. Such act is done by force or against the will of the other. In any case where the consent or acquiescence of the other is procured by threats of violence toward any person, the act is done against the will of the other.

. . . . .

Iowa Code § 709.1 (1981).

Sexual abuse in the second degree. A person commits sexual abuse in the second degree when the person commits sexual abuse under any of the following circumstances:

1. During the commission of the sexual abuse the person displays in a threatening manner a deadly weapon, or uses or threatens to use force creating a substantial risk of death or serious injury to any person.

. . . . .

Iowa Code § 709.3 (1981).

Kidnapping in the first degree is a class "A" felony, Iowa Code § 710.2 (1981), punishable by life imprisonment without the possibility of parole. Iowa Code § 902.1 (1981). Sexual abuse in the second degree is a class "B" felony, Iowa Code § 709.3 (1981), punishable by an indeterminate sentence up to 25 years. Iowa Code §§ 902.3, 902.9 (1981). A person serving an indeterminate sentence is released from custody after the completion of the maximum term unless released earlier on parole as determined by the Iowa Board of Parole. *See* Iowa Code § 902.6, Iowa Code Chapter 906 (1981).

In *State v. Rich*, 305 N.W.2d 739 (Iowa 1981), the Supreme Court of Iowa recognized that a sexual abuse always contains some element of confinement or removal. The *Rich* court, in interpreting Iowa Code § 710.1, found that the Iowa legislature

> intended the terms "confines" and "removes" to require more than the confinement or removal that is an inherent incident of commission of the crime of sexual abuse. Although no minimum period of confinement or distance of removal is required for conviction of kidnapping, the confinement or removal must definitely exceed that normally incidental to the commission of sexual abuse. Such confinement or removal must be more than slight, inconsequential, or an incident inherent in the crime of sexual abuse so that it has a significance independent from sexual abuse. Such confinement or removal may exist because it substantially increases the risk of harm to the victim, significantly lessens the risk of detection, or significantly facilitates escape following the consummation of the offense.

> The rationale for this conclusion is that we do not believe the legislature intended to afford the prosecution a choice of two penalties of such a disparate nature for the typical crime of sexual abuse. The disparity between the sentences for first-degree kidnapping and third-degree sexual abuse—life imprisonment as opposed to not more than ten years—is significant. Although the plain language of section 710.1 appears to encompass the usual case of sexual abuse, in which some movement or confinement occurs, a literal interpretation of the statutory language would not be sensible or just. We therefore believe that because of the substantial disparity between sentences the legislature intended the kidnapping statute to be applicable only to those situations in which confinement or removal definitely exceeds that which is merely

incidental to the commission of sexual abuse.

*Rich,* 305 N.W.2d at 745.

■ Challenges for vagueness which do not involve First Amendment freedoms generally must be examined in light of the facts of the case at issue. *United States v. Powell,* 423 U.S. 87, 92–93, 96 S.Ct. 316, 319–20, 46 L.Ed.2d 228 (1975); *United States v. Mazurie,* 419 U.S. 544, 550, 95 S.Ct. 710, 714, 42 L.Ed.2d 706 (1975); *Sodders v. Parratt,* 693 F.2d 811, 812–13 (8th Cir.1982). The fact that the legislature might "have chosen '[c]learer and more precise language' equally capable of achieving the end which it sought does not mean that the statute which it in fact drafted is unconstitutionally vague." *Powell,* 423 U.S. at 94, 96 S.Ct. at 321 (quoting *United States v. Petrillo,* 332 U.S. 1, 7, 67 S.Ct. 1538, 1541, 91 L.Ed. 1877 (1947)); *United States v. Eklund,* 733 F.2d 1287, 1302 (8th Cir.1984), *cert. denied,* 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985). The United States Supreme Court, in evaluating claims that a statute is vague on its face, has set forth some of the dangers of vague laws.

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermisibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

*Grayned v. City of Rockford,* 408 U.S. 104, 108–9, 92 S.Ct. 2294, 2298–99, 33 L.Ed.2d 222 (1972). *See also Village of Hoffman Estates v. The Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). To be vague on its face, a law must be "impermissibly vague in all of its applications." *Hoffman,* 455 U.S. at 497, 102 S.Ct. at 1193.

It is true that the statute as interpreted by *Rich* provides no bright line test for when confinement and removal exceed that normally incidental to the commission of a sexual abuse. The question is whether the imprecision, as applied to the facts of this case, is unconstitutionally vague.

■ Petitioner has presented jury instruction 20, the marshaling instruction for kidnapping in the first degree, and jury instruction 22, the marshaling instruction for sexual abuse in the second degree. The instruction on sexual abuse in the second degree was submitted to the jury as a lesser included offense. Petitioner asserts that instruction 20 requires proof of no element or fact different from instruction 22.[4] This is plainly not the case. The instruction on first degree kidnapping requires proof that petitioner "confined" or "removed" the victim. The instruction on second degree sexual abuse contains no such element. Petitioner's argument that the element of the second degree sexual abuse offense requiring that the sexual abuse be "performed by force and against the will" of the victim implicitly requires proof of confinement or removal, and that thus the same elements are included, is unpersuasive. The Supreme Court of Iowa, in *Rich,* conceded that sexual abuse always contains some element of confinement and/or removal. The question is when does that confinement and/or removal have a "significance independent from sexual abuse." *Rich,* 305 N.W.2d at 745. In order to obtain a conviction of first

---

**4.** Petitioner argues that second degree sexual abuse requires proof of an element not required for first degree kidnapping, namely that "the person displays in a threatening manner a deadly weapon, or uses or threatens to use force creating a substantial risk of death or injury to any person." The Iowa Supreme Court has held

that second degree sexual abuse is a lesser included offense of first degree kidnapping. *Lamphere v. State,* 348 N.W.2d 212, 218 (Iowa 1984); *State v. Davis,* 328 N.W.2d 301, 307–8 (Iowa 1982); *State v. Whitfield,* 315 N.W.2d 753, 755 (Iowa 1982).

degree kidnapping, the State must show beyond a reasonable doubt confinement and/or removal which exceeds the "incidental." In proving second degree sexual abuse, the State need not prove confinement or removal as an explicit element of the offense.

■ Petitioner further argues that the *Rich* interpretation of the statute rests on an unsupported belief that a jury will intrinsically know the contours of the line between second degree sexual abuse and first degree kidnapping. The court does not find that allowing the jury to determine whether that line has been crossed, subject to the review of the Iowa courts as to whether the evidence supports the jury's decision, is impermissible. Due to the infinite variety of possible factual scenarios, whether or not the line has been crossed must necessarily depend on the facts of each case. The legislature is not required to fashion a bright line test, for example, that confining the victim for more than an hour or moving the victim more than 1,000 feet, constitutes kidnapping. It is sufficient if the jury is properly instructed according to the law and if that law is not unconstitutionally vague.

> Petitioner states in his brief that
> If the facts and circumstance of this case are interpreted in a light most favorable to the State, they show that [petitioner] abducted [the victim] from the parking lot at Harding Junior High School in order to take her to a less populated area not far from town, and then force her to perform a sex act upon him, and that when that was done, to go with her back to the parking lot and then on to work. All this was for the purpose of committing the offense of sexual abuse.

Petitioner's brief, filed November 1, 1989, at 16. Petitioner argues that "the confinement and removal [of the victim] was done to further the commission of the sexual abuse, which, [under Iowa Code § 702.13 (1981)], begins with the first act undertaken to facilitate the offense and continues until the last act taken to facilitate the offense, including attempts to avoid discovery or escape from authorities." Petitioner's brief at 16. This argument is valid in the sense that the crime of first degree

kidnapping began with the initial contact in the parking lot and ended with the victim returning petitioner to his car. Petitioner's argument, taken to its logical extreme, would lead to the conclusion that *any* confinement or removal, no matter how severe or extended in time or distance, if done with the intent to commit sexual abuse, would not constitute kidnapping. The court cannot accept this argument. The question here is whether the line drawn by the legislature and the Iowa Supreme Court in *Rich* between first degree kidnapping and confinement and removal incidental to sexual abuse is unconstitutionally vague as applied to the facts of this case. In other words, whether the facts of this matter contain the "something more" which elevates a second degree sexual abuse to a first degree kidnapping.

The line drawn by the legislature and *Rich* distinguishes the confinement and removal present in this case (confinement and removal to a secluded location five miles from the parking lot) from the situation where the victim is grabbed by her assailant in the street and dragged into the nearest alley for the commission of the sexual assault. In *State v. Marr*, 316 N.W.2d 176 (Iowa 1982), a case involving the latter fact pattern, the Iowa Supreme Court found that "the State failed to sustain its burden of proof under the kidnapping charge that the confinement or removal definitely exceed[ ] that normally incidental to the commission of sexual abuse." *Id.* at 180. The Supreme Court of Iowa and the Iowa Court of Appeals have had several other opportunities to discuss the confinement and removal element of kidnapping. *See State v. Hardin*, 359 N.W.2d 185 (Iowa 1984) (assault of victim in car and removal of victim to defendant's home held sufficient to constitute kidnapping); *State v. Ristau*, 340 N.W.2d 273 (Iowa 1983) (movement to secluded location held sufficient to support kidnapping conviction); *State v. Newman*, 326 N.W.2d 788 (Iowa 1982) (*Newman I*) (luring victim into vehicle with false police badge, transportation to various places including secluded, wooded area, repeated acts of sexual abuse, and threats of physical harm held sufficient); *State v. New-*

*man,* 326 N.W.2d 796 (Iowa 1982) (*Newman II*) (enticing victim into vehicle by false representation that police officer, driving to several locations including road unoccupied by dwellings; although closer case than *Newman I,* facts held sufficient for kidnapping); *State v. Folck,* 325 N.W.2d 368 (Iowa 1982) (confinement for several hours and removal to secluded spot for purpose of sexual abuse held sufficient); *State v. Mead,* 318 N.W.2d 440 (Iowa 1982) (burglar's brief detention of homeowner and daughter not sufficient to uphold kidnapping conviction); *State v. Knupp,* 310 N.W.2d 179 (Iowa 1981) (pulling victim into vehicle, removal six or seven blocks to underneath bridge and hitting victim several times to subdue her before commission of sexual abuse held sufficient); *State v. Holderness,* 301 N.W.2d 733 (Iowa 1981) (transportation of victim several miles into countryside plus confinement for two hours found sufficient); *State v. Tryon,* 431 N.W.2d 11 (Iowa App. 1988) (tying victim to her bed in her apartment, confinement for several hours, repeated sexual assaults which included torture, and other elements held sufficient); *State v. Coen,* 382 N.W.2d 703 (Iowa App. 1985) (slashing tire of victim's car, gaining her confidence by assisting her, asking for ride home, and directing victim to secluded, unlighted warehouse district, held sufficient for kidnapping conviction).

Petitioner cites to *Kidnapping in Iowa: Movements Incidental to Sexual Abuse,* 67 Iowa L.Rev. 773 (1982), for the proposition that "it is not clear that movement from relative seclusion to absolute seclusion [for the purpose of committing a sexual abuse] adds significant additional risks." *Id.* at 794. However, the determination that confinement and/or removal beyond the "incidental" significantly increases the risk to the victim is a legislative judgment within the purview of the Iowa legislature. This court cannot conclude that confinement or removal *never* increases the risk to the victim. As previously noted, the question to be resolved is whether petitioner's conduct crossed the line between confinement and removal incidental to second degree sexual abuse and the confinement and removal sufficient to meet the requirements of first degree kidnapping as defined by the Iowa legislature and interpreted by the Iowa Supreme Court in *Rich.* Petitioner does not contest the fact that the victim was driven approximately five miles from the parking lot to the secluded rural area where the sexual abuse took place. This court has no difficulty in finding that this distance crosses the line between confinement and removal incidental to sexual abuse and that degree of confinement and removal which constitutes kidnapping. Removal of the victim to a distant, secluded location, in this court's view, "substantially increases the risk of harm to the victim, significantly lessens the risk of detection, [and] significantly facilitates escape following the commission of the offense." *Rich,* 305 N.W.2d at 745. The court also concludes that the jury could find that the line had been crossed under the facts of this case. Any reasonable person could foresee that the criminal conduct which took place here would violate the first degree kidnapping statute. It is reasonably apparent that removal for such a distance, especially removal to a secluded rural spot, could and would constitute kidnapping. The kidnapping statute as interpreted by *Rich* and as applied to the facts of this case is not unconstitutionally vague. Petitioner had adequate notice that his offense would fall under the terms of the statute.

### Instruction 19

Petitioner also argues that the trial court's instruction 19, which defines the confinement and removal necessary to find first degree kidnapping, and the Iowa Supreme Court's approval of that instruction in *Hatter III,* significantly departs from *Rich,* and thus violates petitioner's right to due process.

One of the essential elements of Kidnapping which the State must prove beyond a reasonable doubt is that Deborah [ ] was confined or removed or both. This requires more than the confinement or removal that is inherent within the commission of the offense of sexual abuse, as it is alleged to have occurred in this case.

Although no minimal period of confinement or distance of removal is required, it must exceed that which is incidental or dependent upon the commission of any sexual abuse and must be more than slight, inconsequential or as an incident inherent to any sexual abuse so that the confinement or removal or both has a significance separate and apart from any sexual abuse.

Such confinement or removal or both may exist because it substantially increases the risk of harm to the victim or significantly lessens the risk of detection or significantly facilitates escape. However, it is for you, the jury, after a full and impartial consideration of the evidence admitted during the trial, to determine whether there is confinement or removal or both as defined herein.

Instruction 19. *See* petitioner's appendix, at 118.

■■■ Petitioner argues that this instruction is a significant departure from the language of *Rich* that first degree kidnapping is committed when the confinement or removal *"definitely* exceeds that *normally* incidental to sexual abuse." (emphasis added). Petitioner argues that the omission of the words "definitely" and "normally" and the addition of the word "any" before the term "sexual abuse" in the instruction expands the limits of the confinement and removal sufficient to support a conviction for first degree kidnapping.

When [an] unforeseeable state-court construction of a criminal statute is applied retroactively to subject a person to criminal liability for past conduct, the effect is to deprive him of due process of law in the sense of fair warning that his contemplated conduct constitutes a crime.

*Bouie v. City of Columbia,* 378 U.S. 347, 354–55, 84 S.Ct. 1697, 1703, 12 L.Ed.2d 894 (1964). *See also Marks v. United States,* 430 U.S. 188, 192, 97 S.Ct. 990, 993, 51 L.Ed.2d 260 (1977). This principle also applies to a judicial construction of a statute that aggravates a crime. *Bouie,* 378 U.S. at 353, 84 S.Ct. at 1702; *Moore v. Wyrick,* 766 F.2d 1253, 1254 (8th Cir.1985), *cert. denied,* 475 U.S. 1032, 106 S.Ct. 1242, 89 L.Ed.2d 350 (1986). Whether a judicial expansion of a criminal statute was not foreseeable and thus whether the construction can be applied retroactively is a question of federal law subject to determination by this court. *Moore,* 766 F.2d at 1255. However, "the views of the State's highest court with respect to state law are binding on the federal courts." *Wainwright v. Goode,* 464 U.S. 78, 84, 104 S.Ct. 378, 382, 78 L.Ed.2d 187 (1983); *Brown v. Ohio,* 432 U.S. 161, 167, 97 S.Ct. 2221, 2226, 53 L.Ed.2d 187 (1977); *Tyndall v. Gunter,* 840 F.2d 617, 618 (8th Cir.1988).

■■ In *Hatter III,* the Iowa Supreme Court found that instruction 19 "is essentially the same as" Iowa Criminal Jury Instruction 1007, although it deviates slightly. *Hatter III* at 336–37. The uniform instruction "states that the period of confinement or the distance of removal 'must exceed that which is *normally* incidental or dependent upon the commission of' sexual abuse." *Hatter III* at 336. The Iowa Supreme Court concluded that the omissions of the words "normally" and "definitely" from the *Rich* formulation and the addition of "any" was not error on the part of the trial court and that the instruction given adequately conveyed the principles enunciated in *Rich. Hatter III* at 336–337. The court also concluded that the instruction as given was not confusing nor did it require the jury to engage in speculation. *Id.* The court found "that persons of ordinary intelligence will readily understand what confinement or removal exceeds that which is incident to the commission of sexual abuse without further explanation." *Id.* at 337.

This court finds that the alteration in the precise wording of the requirements of confinement and removal, as set forth in *Rich,* in instruction 19 is not so significant so as to violate petitioner's right of due process. As previously discussed, there is fair warning that petitioner's conduct would constitute first degree kidnapping. Under either instruction 19 or the *Rich* formulation, the degree of confinement and removal present in this case "definitely exceeds that normally incidental to sexual abuse" and "exceed[s] that which is incidental or dependent upon the commission of any sexual

abuse." Both the *Rich* formulation and instruction 19 express the essence of the greater confinement and removal required to find first degree kidnapping. There is no unforeseeable judicial alteration of the essential elements of the *Rich* standard. The court finds that the instruction given adequately states the relevant law and does not unconstitutionally alter that law.

### Requested Instruction on Penalties

■ Petitioner argues that if, as he requested, the trial judge had instructed the jury on the penalties for first degree kidnapping and second degree sexual abuse, the jury would have had greater assistance in interpreting the meaning of confinement and removal incident to a sexual abuse. Petitioner argues that the failure to instruct on penalties violates his right to require the State to prove each element of the offense beyond a reasonable doubt. The Iowa Court of Appeals in *Hatter II*[5] found no error in the trial court's refusal to instruct on penalties. The general Iowa rule is that the jury should not be informed of the applicable penalties. *See State v. Loucks*, 218 Iowa 714, 253 N.W. 838, 841 (1934); *State v. Purcell*, 195 Iowa 272, 191 N.W. 849, 850 (1923) ("The jury has no concern with the punishment which the law prescribes. Its function is to determine the fact question as to whether the defendant is guilty or not guilty."). *See also* Iowa Criminal Instruction 100.13 ("The duty of the jury is to determine if the defendant is guilty or not guilty. In the event of a guilty verdict, you have nothing to do with punishment.") The court finds that the arguments raised by petitioner regarding an instruction on penalties present only arguments of policy and raise no valid constitutional issue. This court cannot see how the trial court's refusal to instruct on penalties can affect the requirement that the State prove confinement and/or removal beyond a reasonable doubt.

### Inculpatory Statements

Petitioner contends that the trial court erred in overruling his motion to suppress on the grounds of involuntariness, his inculpatory statements to the authorities made shortly after his arrest, and erred in not allowing petitioner to take the stand to deny the elements of the offense without opening the door to impeachment by use of these inculpatory statements. These arguments were discussed by the Iowa Supreme Court in *Hatter III*, 414 N.W.2d at 338–9.

In *Hatter I*, the Iowa Supreme Court found that petitioner's inculpatory statements were the product of a warrantless arrest in violation of the Fourth Amendment and thus should have been suppressed at petitioner's first trial. *Hatter I*, 342 N.W.2d at 856–57. In *Hatter II*, it was stated that the prosecution could use the inculpatory statements for the purpose of impeachment if petitioner chose to take the stand and deny the elements of the crime charged. *Hatter II*, 381 N.W.2d at 374. *Hatter II* did not discuss whether petitioner's statements were voluntary. The third trial court denied petitioner's motion to suppress on the grounds of involuntariness. *See* petitioner's appendix at 53–55. The trial court further held, on a motion to adjudicate law points, that the statements would be admissible for impeachment purposes. *See* petitioner's appendix at 52. Petitioner did not testify.

■ A defendant's statement obtained in violation of the constitution which is otherwise inadmissible may be admitted for the purpose of impeachment if the statement was voluntarily made. *See New Jersey v. Portash*, 440 U.S. 450, 458–59, 99 S.Ct. 1292, 1296–97, 59 L.Ed.2d 501 (1979); *Mincey v. Arizona*, 437 U.S. 385, 397–98, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978); *Oregon v. Hass*, 420 U.S. 714, 95 S.Ct. 1215, 43 L.Ed.2d 570 (1975); *Harris v. New York*, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971) (statement inadmissible in prosecution's case in chief due to *Miranda* violation may, if its trustworthiness satisfies legal standards, be used for impeachment of defendant's trial testimony); *Jackson v. Denno*, 378 U.S. 368, 376, 84 S.Ct. 1774, 1780, 12 L.Ed.2d 908 (1964) (Any criminal trial use of an involuntary statement is a denial of due process.). This rule had its genesis in *Walder v. United States*, 347

---

**5.** The reasoning in *Hatter II* was adopted by reference in *Hatter III*, 414 N.W.2d at 337.

U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954). In *Walder*, the evidence at issue was heroin seized in violation of the Fourth Amendment. There it was held that the heroin could be admitted to impeach Walder's assertion that he had never used, sold or possessed narcotics. *Walder*, 347 U.S. at 64–65, 74 S.Ct. at 355–56. In the recent case of *James v. Illinois*, —— U.S. ——, 110 S.Ct. 648, 107 L.Ed.2d 676 (1990), the Supreme Court discussed and reaffirmed this principle.[6]

■ Accordingly, this court must first determine whether petitioner's statements to the police were made voluntarily. While the ultimate question of voluntariness is a question of law, the underlying factual determinations are entitled to a presumption of correctness. *Miller v. Fenton*, 474 U.S. 104, 110–112, 106 S.Ct. 445, 449–50, 88 L.Ed.2d 405 (1985); *Woods v. Armontrout*, 787 F.2d 310, 313 (8th Cir.1986), *cert. denied*, 479 U.S. 1036, 107 S.Ct. 890, 93 L.Ed.2d 842 (1987). *See also Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); 28 U.S.C. § 2254(d). Pursuant to 28 U.S.C. § 2254(d), "a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State ... were parties, evidenced by a written finding ... shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit" one of eight enumerated exceptions to the presumption of correctness. Petitioner has presented no argument that the state trial court's factual findings on this issue should not be given the presumption of correctness. The court further finds that it does not "otherwise appear" that any of the eight exceptions applies to the state court's factual findings.

These factual findings were as follows: [O]n April 1, 1982, the Defendant ... was taking a shower when Detective Hansel came in to [sic] the bathroom and advised him he was under arrest for Kidnapping occurring on the previous evening. The Defendant was in fact naked at the time the officer arrested him; however, immediately thereafter, by the Defendant's own testimony, the Defendant was taken into his own bedroom and told to put on underwear, which he did. By the Defendant's own testimony, shortly thereafter he was given clothes from his dresser and allowed to dress. He was also read his rights at the house by the testimony of Officer Hagist. Apparently during the trip downtown [the arresting officers] made comments that they wanted to wrap this matter up and get home as soon as possible. The Defendant assumed that they included him in the 'getting home' portion of the comments.

At the police department the Defendant was taken into an interrogation room approximately 8' by 8' or 8' by 10', given a copy of the Waiver of Rights, again read his rights, and told that if he wanted to sign it, that the police could talk to him.

The Court finds at no time did the Defendant request an attorney; and at no time did he request that questioning cease.

By the Defendant's own testimony, apparently it was about 24 hours before he ate; ... However, only 4½ to 5 hours of the time in which he had not eaten were spent in custody. The Court also finds that even though the Defendant has admitted to substantial drug use, at the time he signed the Waiver of Rights and both statements that he was not under the influence of alcohol and drugs, and was in fact responding coherently and appropriately under the circumstances.

The Court also finds that the Defendant in this case is an intelligent young man who had previously been enrolled in a pre-med program at Iowa State University; his grade point average was 3.2 when he graduated from high school.

The Court also finds that the original arrest of the Defendant was not for the assault of the victim in this case; and, in fact, at the time of questioning the de-

---

6. The *James* court refused to expand this exception to the exclusionary rule to permit the impeachment of defense witnesses, other than the defendant, with illegally obtained evidence.

fendant, the detectives only had a small bit of information about the assault on [Deborah].

Ruling re: motion to suppress, May 7, 1986, petitioner's appendix at 53–54.

 The trial court concluded that petitioner's confession was freely and voluntarily given. *Id.* The Iowa Supreme Court, in *Hatter III*, in conducting its de novo review of the trial court's ruling on the motion to suppress, accepted the trial court's factual findings. *Hatter III*, 414 N.W.2d at 339. The *Hatter III* court further stated that "[o]ur review of the evidence causes us to give greater credit to the peace officers' testimonies that no promises or threats had been made to the defendant to obtain his statement, and that defendant had not been told things would go easier for him if he gave his statement." *Id.* Factual findings of a state appellate court are also to be given the presumption of correctness. *See Sumner*, 449 U.S. at 545–47, 101 S.Ct. at 768–69; *Brooks v. Kinchloe*, 848 F.2d 940, 943 (9th Cir.1988); *United States ex rel. Ross v. Franzen*, 688 F.2d 1181, 1184 (7th Cir.1982); *Dickerson v. State of Alabama*, 667 F.2d 1364, 1368 (11th Cir.), *cert. denied*, 459 U.S. 878, 103 S.Ct. 173, 74 L.Ed.2d 142 (1982).

 When a defendant's statement is challenged as having been involuntarily made, the State bears the burden of proving voluntariness by a preponderance of the evidence. *Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986); *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972). In determining the voluntariness of a confession, the record must be examined for "evidence that the statement was given under such circumstances which would indicate that the defendant was coerced or his will overborne." *United States v. Wilson*, 787 F.2d 375, 380–381 (8th Cir.), *cert. denied*, 479 U.S. 865, 107 S.Ct. 223, 93 L.Ed.2d 151 (1986); *Davis v. North Carolina*, 384 U.S. 737, 742, 86 S.Ct. 1761, 1765, 16 L.Ed.2d 895 (1966); *United States v. Jorgensen*, 871 F.2d 725, 729 (8th Cir. 1989). "In this analysis the court employs a flexible totality of the circumstances approach, considering the specific interrogation tactics employed, the details of the

interrogation, and the characteristics of the accused." *Wilson*, 787 F.2d at 381; *Russell v. Jones*, 886 F.2d 149, 151 (8th Cir. 1989); *Rachlin v. United States*, 723 F.2d 1373, 1377 (8th Cir.1983).

 Petitioner presents three facts which were not explicitly discussed by the Iowa courts. First, the officers told petitioner's grandfather to leave the bedroom or be arrested for interference with the investigation. *See* petitioner's appendix at 29–30 (testimony of J.V. Hatter, petitioner's grandfather). Petitioner could have requested to speak with his grandfather. *See* Iowa Code § 804.20 (1981) ("Any peace officer ... having custody of any person arrested ... shall permit that person, without unnecessary delay after arrival at the place of detention, to call, consult, and see a member of his or her family ..."). Second, petitioner was not told that an attorney contacted by petitioner's grandfather had called the police station to see what the situation was. *See* petitioner's appendix at 32 (testimony of J.V. Hatter), 47 (testimony of petitioner). Petitioner did not have a constitutional right to be told that an attorney had attempted to reach him. *Moran v. Burbine*, 475 U.S. 412, 420–28, 106 S.Ct. 1135, 1140–44, 89 L.Ed.2d 410 (1986). Iowa Code § 804.20 (1981) does provide that "[a]n attorney shall be permitted to see and consult confidentially with such person alone and in private ... without unreasonable delay." However, any claim of petitioner based on this statute is an issue of state law and not an issue of constitutional law cognizable in a federal habeas corpus proceeding. Even so, the record before this court suggests only that the attorney contacted by petitioner's grandfather called the police station, spoke with the desk sergeant, and was informed that petitioner had not yet been booked. *See* petitioner's appendix at 32 (testimony of J.V. Hatter). There is no evidence in the record before this court that the attorney requested to speak personally with petitioner. Third, the interrogation could have been but was not recorded. *See* petitioner's appendix at 22–23 (testimony of detective Douglas R. Fuller). With respect to this last point, petitioner testified that he had told the

officers that it was not all right with him to record the conversation. *See* petitioner's appendix at 45.

■ The court finds that the "totality of the circumstances" shows that petitioner's confession was made voluntarily. Petitioner is intelligent, and the court cannot assume that he did not understand his rights. He never requested an attorney or refused to answer questions. Additionally, he signed a waiver of his rights. This court is bound by the state court findings that no promises of leniency were made and that petitioner was not so affected by drugs or alcohol so as to influence his ability to reason. The court further notes that a defendant's perception of leniency, which the trial court found to exist, is insufficient to make a confession involuntary. *See United States v. Hawkins*, 823 F.2d 1020, 1023 (7th Cir.1987); *Rachlin*, 723 F.2d at 1378. While the record does not indicate how the subject of the assault on Deborah came up, petitioner was arrested for a different offense. The court finds that petitioner's statements were voluntarily made.

■ Petitioner further argues that several of his constitutional rights were violated by the ruling of the Iowa courts that he could not take the stand to deny the commission of the offense without the admission of the inculpatory statements for the purposes of impeachment. However, there is no constitutional right to commit perjury, and the use of illegally obtained evidence for the purpose of impeachment does not violate the policies behind the exclusionary rule. *See United States v. Havens*, 446 U.S. 620, 626–27, 100 S.Ct. 1912, 1916, 64 L.Ed.2d 559 (1980). *See also Nix v. Whiteside*, 475 U.S. 157, 173, 106 S.Ct. 988, 997, 89 L.Ed.2d 123 (1986) ("Whatever the scope of a constitutional right to testify, it is elementary that such a right does not extend to testifying *falsely*."). In *James*, the Supreme Court stated that this exception to the exclusionary rule

penalizes defendants for committing perjury by allowing the prosecution to expose their perjury through impeachment using illegally obtained evidence. Thus defendants are discouraged from the first instance from 'affirmatively resort[ing] to perjurious testimony.' *Walder, supra*, 347 U.S., at 65, 74 S.Ct., at 356. But the exception leaves defendants free to testify truthfully on their own behalf; they can offer probative and exculpatory evidence to the jury without opening the door to impeachment by carefully avoiding any statements that directly contradict the suppressed evidence. The exception thus generally discourages perjured testimony without discouraging truthful testimony.

*James*, —— U.S. at —— – ——, 110 S.Ct. at 652–53. The court does recognize that the scope of petitioner's confession effectively prevented petitioner from taking the stand at all. Almost anything that petitioner would have said, including a denial of the commission of the offense, would have been in contradiction of the confession and would have allowed its admission for impeachment purposes.

■ Petitioner points to several specific constitutional rights that he claims were violated. First is the right to plead not guilty and, by the plea, deny each and every element of the offense charged. *Cf. Ezzard v. United States*, 7 F.2d 808 (8th Cir.1925). Petitioner's plea of not guilty stood as a denial of each and every element of the offense charged.[7] The impeachment rule does not in any way convert petitioner's plea to a plea of guilty.

■ Second is the right to the presumption of innocence and the right to require the state to introduce competent evidence to prove guilt beyond a reasonable doubt as to each and every element of the offense. *Coffin v. United States*, 156 U.S. 432, 452–461, 15 S.Ct. 394, 402–05, 39 L.Ed. 481 (1895). Petitioner's right to be presumed innocent was not violated. The bur-

---

7. Iowa Criminal Jury Instruction 100.2 states that the defendant's "plea of not guilty is a complete denial of the charge(s)." It is unclear from the record whether this or a similar instruction was actually given, although the trial court's ruling of May 7, 1986, on petitioner's motion to adjudicate law points states that such an instruction would be given. *See* petitioner's appendix at 52.

den at all times remained on the state to prove each and every element of the offense beyond a reasonable doubt. Additionally, the trial judge must, if requested, instruct the jury that the defendant's failure to testify may not be considered as evidence of guilt.[8] *Carter v. Kentucky,* 450 U.S. 288, 101 S.Ct. 1112, 67 L.Ed.2d 241 (1981). This instruction is not given in Iowa unless specifically requested by the defendant. *State v. Kimball,* 176 N.W.2d 864, 869 (Iowa 1970).

▇▇▇ Third is the right to take the stand and testify on his own behalf. *See Rock v. Arkansas,* 483 U.S. 44, 49–53, 107 S.Ct. 2704, 2708–10, 97 L.Ed.2d 37 (1987) (right of defendant to testify arises under the Due Process Clause of the Fourteenth Amendment, the Compulsory Process Clause of the Sixth Amendment and the Fifth Amendment privilege against self incrimination); *Harris,* 401 U.S. at 225, 91 S.Ct. at 645 ("Every criminal defendant is privileged to testify in his own defense, or to refuse to do so."); *United States v. Bernloehr,* 833 F.2d 749, 751 (8th Cir.1987). Petitioner had the option of taking the stand. Not taking the stand was a tactical decision on the part of petitioner and his counsel. As previously noted, petitioner had no right to take the stand and commit perjury. The trial court would have been required to instruct the jury that the inculpatory statements could only be used for determining petitioner's credibility and not as substantive evidence of guilt. Petitioner could have taken the stand and attempted to convince the jury that his statements on the stand should be believed. *Cf. United States v. Raddatz,* 447 U.S. 667, 678, 100 S.Ct. 2406, 2413, 65 L.Ed.2d 424 (1980) ("A defendant who has not prevailed at the suppression hearing remains free to present evidence and argue to—and may persuade—the jury that the confession was not reliable and therefore should be disregarded.").

The court finds that no constitutional right of petitioner was violated by the rulings that his statements would have been admissible for the purpose of impeachment.

### Eighth Amendment

▇▇▇ Petitioner argues that his sentence, life imprisonment without the possibility of parole, violates the Eighth Amendment prohibition against cruel and unusual punishment. He argues that his sentence is disproportionate to the offense that he committed.

The two primary United States Supreme Court cases discussing the proportionality of sentences of life imprisonment are *Rummel v. Estelle,* 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), and *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). Both cases involved life sentences imposed upon recidivists. *Rummel* upheld a sentence of life imprisonment with parole. *Helm* struck a sentence of life imprisonment without parole as disproportionate to the offense committed. In *Helm,* the Supreme Court set forth the criteria to be considered in determining whether a punishment is disproportionate. Those primarily objective criteria are "(i) the gravity of the offense and the harshness of the penalty; (ii) the sentences imposed on other criminals in the same jurisdiction; and (iii) the sentences imposed for commission of the same crime in other jurisdictions." *Helm,* 463 U.S. at 292, 103 S.Ct. at 3010. The court does note that "[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." *Rummel,* 445 U.S. at 272, 100 S.Ct. at 1138 (quoted in *Helm,* 463 U.S. at 289–290, 103 S.Ct. at 3009).

Petitioner asserts that a sentence of life imprisonment without the possibility of parole is essentially a sentence to die in prison and is thus equivalent to the death penalty. However, "the death penalty is

---

8. The record before this court does not indicate whether such an instruction was given or requested, nor does it indicate the precise instructions, if any, given defining the presumption of innocence and the definition of beyond a reasonable doubt. *See* Iowa Criminal Jury Instruc- tions 100.4 (presumption of innocence), 100.10 (reasonable doubt), 200.40 (defendant's failure to testify). Instruction 20, petitioner's appendix at 119, does require the jury to find each of the three elements of kidnapping in the first degree beyond a reasonable doubt.

different from other punishments in kind rather than degree." *Helm,* 463 U.S. at 294, 103 S.Ct. at 3012; *Furman v. Georgia,* 408 U.S. 238, 306, 92 S.Ct. 2726, 2760, 33 L.Ed.2d 346 (1972) (Stewart, J., concurring). Consequently, the United States Supreme Court has recognized that its " 'decisions [in] capital cases are of limited assistance in deciding the constitutionality of the punishment' in a noncapital case." *Helm,* 463 U.S. at 289, 103 S.Ct. at 3009 (quoting *Rummel,* 445 U.S. at 272, 100 S.Ct. at 1138). However, it has been recognized by the Eighth Circuit Court of Appeals that a life sentence without parole qualitatively differs from other sentences of imprisonment. *Helm v. Solem,* 684 F.2d 582, 585 (8th Cir.1982), *aff'd,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983). A life sentence without parole "totally rejects rehabilitation as a basic goal of our criminal justice system." *Id.* The Supreme Court has held that the proportionality analysis of the Eighth Amendment applies to sentences of imprisonment. *Helm,* 463 U.S. at 290, 103 S.Ct. at 3009 ("[W]e hold as a matter of principle that a criminal sentence must be proportionate to the crime for which the defendant has been convicted.... [N]o penalty is *per se* constitutional.").

The court has examined *Rummel* and *Helm* and finds that neither is precisely on point. In *Rummel,* the Supreme Court upheld a mandatory life sentence under the Texas recidivist statute after Rummel's conviction for his third felony, obtaining $120.75 by false pretenses.[9] The *Rummel* court suggested that "the length of the sentence actually imposed is purely a matter of legislative prerogative." *Rummel,* 445 U.S. at 274, 100 S.Ct. at 1139. The breadth of this assertion was rejected in *Helm,* 463 U.S. at 288, n. 14, 103 S.Ct. at 3009, n. 14 ("The Court did not adopt [this] standard ..., but merely recognized that the argument was possible. To the extent that the State—or the dissent ...—makes this argument here, we find it meritless."). *Rummel* is distinguishable from the present case in three major respects. First, the *Rummel* court noted that the

state's interest in *Rummel* was greater than punishment for the crime committed. The purpose of a recidivist statute is to deal "in a harsher manner with those who by repeated criminal acts have shown that they are simply incapable of conforming to the norms of society as established by the criminal law." *Rummel,* 445 U.S. at 276, 100 S.Ct. at 1140. In this case, there is no indication in the record that petitioner has been convicted of any other crimes. It is true that he confessed in detail to the sexual assault for which he was arrested, *see* petitioner's appendix at 50C, 50B, and stated that he had "possibly assaulted between 15 and 20 different women." Petitioner's appendix at 50B. However, it appears from the record that petitioner has never been found guilty beyond a reasonable doubt of any offense other than the one for which he is serving the life sentence. Additionally, the Texas recidivist statute requires that in order to receive the mandatory life sentence, the third time felon must have served prison time on each of the first two felonies, thus "a recidivist must twice demonstrate that conviction and actual imprisonment do not deter him from returning to crime once he is released." *Id.* at 278, 100 S.Ct. at 1141.

The second distinguishing feature of *Rummel* is the Supreme Court's finding that, while only two other states had recidivist schemes identical to Texas, almost all states had quite similar statutes. *Id.* at 279–280, 100 S.Ct. at 1142. Some states imposed a mandatory life term after four felonies. Some imposed a life term if one of the felonies was violent. Others provide for a discretionary rather than a mandatory life sentence after three felonies. The sentences which would be imposed in other jurisdictions for petitioner's crime will be discussed later in this opinion.

The third and most important distinction between *Rummel* and the present matter is that Rummel's sentence was life imprisonment *with* the possibility of parole. The *Rummel* court relied heavily on historical data that prisoners sentenced to life impris-

---

**9.** Rummel's prior two convictions were for fraudulent use of a credit card to obtain $80 worth of goods and services and passing a forged check in the amount of $28.36.

onment in Texas were generally eligible for release on parole after serving 12 years. *Rummel*, 445 U.S. at 280–81, 100 S.Ct. at 1142–43. Petitioner has no possibility of parole unless his sentence is commuted to a term of years by the governor.

In *Helm*, the Supreme Court struck a sentence of life imprisonment without parole as disproportionate to the crime committed. Helm received the life sentence after conviction of his seventh felony, uttering a "no account"[10] check in the amount of $100. His prior felony convictions were three third-degree burglaries, obtaining money under false pretenses, grand larceny, and third offense driving while intoxicated. None of Helm's offenses were considered violent, and none were crimes against a person. *Helm*, 463 U.S. at 280, 103 S.Ct. at 1142. *But see Helm*, 463 U.S. at 315–16, 103 S.Ct. at 3022–23 (Burger, C.J., dissenting) (finding the three burglaries and the third offense driving while intoxicated to be violent felonies as they pose a significant risk of harm to others). A major distinction between *Helm* and this matter is that petitioner's crime definitely was a violent crime against a specific person.

*Helm* distinguished a life sentence without parole from *Rummel*, where parole was possible. *Id.* at 297, 300–303, 103 S.Ct. at 3013, 3014–16. This distinction appears to be the primary difference between *Rummel* and *Helm*. *But see Helm*, 463 U.S. at 312 n. 4, 103 S.Ct. at 3021 n. 4 (Burger, C.J., dissenting). The *Helm* court also analyzed the sentences for other crimes within South Dakota and the sentences for the same crime in other jurisdictions. *Id.* at 298–300, 103 S.Ct. at 3013–15. The court found that only one other state, Nevada, would have punished Helm as severely as South Dakota. *Id.* at 299–300, 103 S.Ct. at 3014–15. It does appear that Helm's life sentence without parole was discretionary rather than mandatory. *See Helm*, 463 U.S. at 281–83, 103 S.Ct. at 3005–06.

 It was stated in *Helm* that [r]eviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals.

*Helm*, 463 U.S. at 290, 103 S.Ct. at 3009. The Iowa sentencing court had no discretion in selecting petitioner's sentence. Once the jury returned its verdict of guilty on the first degree kidnapping charge, the court was bound to impose a mandatory sentence of life imprisonment without parole. However, this court still must grant substantial deference to the sentencing scheme chosen by the Iowa legislature. Consequently, the role of this court is to determine if petitioner's sentence is unconstitutionally disproportionate, not to decide if this court would have sentenced petitioner to a lesser punishment. *See Helm*, 463 U.S. 290 n. 16, 103 S.Ct. at 3009 n. 16.

This court must apply the three factor test set forth in *Helm*. The first consideration is the gravity of the offense and the severity of the punishment. The Supreme Court in *Helm* discussed some of the relevant considerations in determining the gravity of the offense. First, "[c]omparisons can be made in light of the harm caused or threatened to the victim or society, and the culpability of the offender.... For example, ... nonviolent crimes are less serious than crimes marked by violence or the threat of violence." *Helm*, 463 U.S. at 292–93, 103 S.Ct. at 3010–11. Second, the "absolute magnitude of the crime may be relevant." *Id.* at 293, 103 S.Ct. at 3011. Other criteria may be appropriate. *Id.* at 294, 103 S.Ct. at 3011. Kidnapping accompanied by the commission of sexual abuse is a very serious crime. Petitioner kidnapped a young woman under a threat of death and armed with an exhibited knife, handcuffed her, moved her five miles to a secluded location, forced her to perform oral sex upon him, and at one point appeared ready to murder her. Petitioner's violent crime is light-years more serious than Helm's crime of uttering a "no account" check. Kidnapping accompanied by sexual assault are, in this court's judgment, of the "absolute magnitude" noted in *Helm* and cause a much greater degree of harm to the victim and to society.

---

**10.** A check for which no bank account existed.

Life imprisonment without the possibility of parole is also a very severe penalty. Iowa law does not provide for the death penalty. Consequently, the penalty of life imprisonment without the possibility of parole is the harshest available under Iowa law. It is true that after five years imprisonment, and regularly thereafter, the Iowa Board of Parole considers whether to recommend that the governor commute the sentence to a term of years. *See* Iowa Code § 902.2 (1989). Consequently, it is possible that petitioner will not spend the rest of his life in prison. However, the possibility of commutation is not equivalent to a possibility of parole, because commutation is an *ad hoc* exercise of executive clemency while "[p]arole is a regular part of the rehabilitative process." *See Helm*, 463 U.S. at 300–303, 103 S.Ct. at 3014–16. Accordingly, the court must assume that, under the sentence imposed, petitioner will spend the rest of his life in prison.

The second factor is the relationship of this crime and its punishment to other crimes and their respective punishments within Iowa's criminal law scheme. Life imprisonment without the possibility of parole is imposed only in cases of murder in the first degree, Iowa Code § 707.2 (1981), sexual abuse in the first degree, Iowa Code § 709.2 (1981) (sexual abuse causing serious injury), and kidnapping in the first degree, Iowa Code § 710.2 (1981) (kidnapping plus serious injury, torture or sexual abuse). Except for first degree kidnapping accompanied by sexual abuse, all of the other class "A" felonies require that the victim suffer torture, serious injury or death.

"Serious injury" means disabling mental illness, or bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ.

Iowa Code § 702.18 (1981). Torture is not defined by the Iowa Code. "Torture," as an undefined term, is given its ordinary meaning. *State v. Cross*, 308 N.W.2d 25, 26 (Iowa 1981). In *Cross*, an instruction that the "action be deliberate or intentional, and that pain be inflicted" was approved. *Id.* at 27. In *State v. Schertz*, 328 N.W.2d 320, 321 (Iowa 1982), the following instruction was approved: " 'Under the law as applied to this case, "torture" is defined as: to intentionally inflict intense pain to body for purposes of punishment, or to abstract a confession or information, or for sadistic pleasure.' "

The victim in this matter did not suffer serious injury as defined in the Iowa Code, or torture, although the potential for serious injury was present. There is no indication in the record that the victim suffered any physical injury other than the discomfort caused by the handcuffs, although, in all likelihood, she would have suffered mental injury from the kidnapping and the forced degradation of the sex act and experienced severe emotional distress. In *Lamphere v. State*, 348 N.W.2d 212 (Iowa 1984), the Iowa Court of Appeals stated:

> Although the harm to the victim in a first-degree murder case clearly outweighs the harm to the victim here, first-degree murder in Iowa includes felony-murder, Iowa Code section 707.2(2), a crime in which defendant need not even have contemplated a killing when commencing a foray into crime. Although first-degree sexual abuse requires the victim to suffer "disabling mental illness, or bodily injury," Iowa Code section 702.-18, it was not unreasonable for the legislature to equate the psychological effects of a kidnapping on a rape victim with the affliction of a mental injury.

*Id.* at 220.

Other crimes also carry a substantial risk of harm to the victim but are not punishable by life imprisonment without the possibility of parole. For example, robbery in the first degree [11] carries a high degree of risk of potential harm to the person robbed. Arson in the first degree [12] is also a serious

---

**11.** A person commits robbery in the first degree when, while perpetrating a robbery, the person purposefully inflicts or attempts to inflict serious injury, or is armed with a dangerous

weapon. Robbery in the first degree is a class "B" felony.

Iowa Code § 711.2 (1981).

**12.** Arson is arson in the first degree when the property which the defendant intends to de-

crime with a high risk of injury. Both are punishable by an indeterminate sentence up to 25 years. There are also crimes which might be considered equally heinous to petitioner's crime but which carry a less severe penalty.

> Willful Injury. Any person who does an act which is not justified and which is intended to cause and does cause serious injury to another commits a class "C" felony.[13]

Iowa Code § 708.4 (1981).

The Iowa Court of Appeals discussed petitioner's Eighth Amendment argument in *Hatter II*.[14] *Hatter II* relied on *Lamphere v. State*, 348 N.W.2d 212 (Iowa 1984), and *State v. Nims*, 357 N.W.2d 608 (Iowa 1984), wherein it was stated,

> (1) [T]he crime of First Degree Kidnapping is one of 'utmost severity' because of the potential for additional harm to a rape victim; (2) the sentence for one who kidnaps and sexually abuses a victim is not disproportionate to other sentences in Iowa because both the kidnapping and the sexual abuse are actually 'two serious, life-threatening crimes instead of only one;' and (3) Iowa is not alone in imposing life imprisonment without parole for those who kidnap with the intent to subject their victims to sexual abuse.

*Hatter II*, 381 N.W.2d at 370 (quoting *Lamphere*, 348 N.W.2d at 220-221).

The potential for additional harm to the victim is amply illustrated in the facts of the present matter. The victim testified that at one point, as they were walking along the road, "all of a sudden I noticed he was behind me; and I turned around and he was holding the knife above my head.... It was starting to come down, so I grabbed his hand.... I finally convinced him to put the knife in the ground. I told him that he was too young for a murder charge and we should just go home and forget the whole thing." Petitioner's ap-

pendix, filed November 1, 1989, at 64. As the victim knew petitioner from high school, it is quite conceivable that he considered murdering her in order to cover up the kidnapping and sexual abuse and his identity. *See* petitioner's appendix at 50D (petitioner's confession) ("I felt that I was going to have to take her somewhere and stab her because she had told me that she had seen me in the school and knew who I was.").

The Iowa Supreme Court in *Lamphere* found that the sentence for kidnapping accompanied by sexual abuse is not disproportionate to other sentences in Iowa because both the kidnapping and the sexual abuse are actually "two serious, life-threatening crimes instead of only one." *Lamphere*, 348 N.W.2d at 220-221. The kidnapping and the sexual abuse essentially merge into one crime, a first degree kidnapping. The actual commission of a sexual abuse is required to elevate the kidnapping into first degree kidnapping. If viewed as two separate crimes, the sexual abuse present in this matter would be sexual abuse in the second degree, a class "B" felony punishable by up to 25 years, and the kidnapping would be kidnapping in the second degree (because the kidnapper was armed with a dangerous weapon), also a class "B" felony. If these had been two separate offenses, the most that petitioner would have received as a sentence is two consecutive 25 year terms with the possibility of parole. *See* Iowa Code § 901.8 (1981). Additionally, the statement quoted above from *Lamphere* is somewhat inconsistent with the finding in *Lamphere*, 348 N.W.2d at 218, and in *State v. Davis*, 328 N.W.2d 301, 307-8 (Iowa 1982) and *State v. Whitfield*, 315 N.W.2d 753, 755 (Iowa 1982), that second degree sexual abuse is generally a lesser included offense of first degree kidnapping. However, given the

---

stroy or damage, or which the defendant knowingly endangers, is property in which the presence of one or more persons can be reasonably anticipated. Arson in the first degree is a class "B" felony.
Iowa Code § 712.2 (1981).

**13.** A class "C" felony is punishable by confinement of up to ten years and a $5,000 fine. If

the felon is a habitual offender the prison sentence may be increased to 15 years. Iowa Code § 902.9 (1981).

**14.** The Court of Appeals' argument was adopted in *Hatter III* by reference. *See Hatter III*, 414 N.W.2d at 339.

danger a kidnap victim faces, the court cannot say that the Iowa legislature was wrong in attempting to protect such a victim by substantially increasing the penalty when the kidnap victim is also actually sexually abused.

Turning to the third factor of *Helm*, the punishment which would be imposed in other states for the same crime, the *Lamphere* court also found that "Iowa is not alone in imposing life imprisonment without parole for those who kidnap with the intent to subject their victims to sexual abuse." *Lamphere*, 348 N.W.2d at 220–21. The court first notes that this is a slight misstatement of the Iowa statute. The victim must *actually* be intentionally subjected to sexual abuse in order for the accused to be convicted of first degree kidnapping. *Lamphere* noted that Louisiana imposes a mandatory life sentence without parole on kidnapping with the intent to subject the victim to sexual abuse. *See* La.Rev.Stat.Ann. § 14:44 (West 1984).[15] The *Lamphere* court further noted that life sentences for kidnapping are imposed in California, Cal.Penal Code § 209 (West 1984) (life imprisonment without parole if victim "suffers death or bodily harm, or is intentionally confined in a manner which exposes such person to a substantial likelihood of death," otherwise life imprisonment with the possibility of parole); West Virginia, W.Va.Code § 61–2–14a (1977) (presumption of life without parole but jury may make binding recommendation of life with parole or judge, if defendant pleads guilty, may, in his discretion, impose sentence of life with parole); Alabama, Ala. Code §§ 13A–5–6(a)(1), 15–22–27.2 (first degree kidnapping, which includes for purpose of sexual abuse, is class "A" felony

punishable by life or definite term of years from 10 to 99, minimum of 20 years if a deadly weapon involved; not eligible for parole after second conviction of a class "A" felony); and South Carolina, S.C.Code Ann. §§ 16–3–20, 16–3–910, 24–13–730 (Law.Co-op.1977) (life imprisonment with parole available after 20 years). In addressing a similar Eighth Amendment challenge to Iowa's first degree kidnapping statute, the Iowa Supreme Court in *State v. Nims*, 357 N.W.2d 608, 611 (Iowa 1984), also cited to the laws of Michigan, Mich. Comp.Laws Ann. §§ 750.349, 769.9, 791.-233b, 791.242 (1968) (sentencing discretion for life, including a minimum term determined by the judge for which parole will not be available, or for any term of years in which not eligible for parole in the first two years); Nevada, Nev.Rev.Stat. §§ 200.310, 200.320 (1980) (Kidnapping for the purpose of committing a sexual assault is first degree kidnapping. If victim suffers substantial bodily harm, jury may determine sentence of life without parole or life with parole after ten years served. If victim suffers no substantial bodily harm, judge has sentencing discretion of five years to life, with parole eligibility after five years); South Dakota, S.D.Codified Laws Ann. §§ 22–6–1(2), 22–19–1, 24–15–4 (1979 and Supp.1983)[16] (If victim suffers gross permanent physical injury, penalty is death or life imprisonment. If not, life but lesser penalty allowed. Person sentenced to life not eligible for parole.); and Tennessee, Tenn.Code Ann. § 39–2–301 (Supp.1983) (repealed by Acts 1989, Ch. 591, § 1, effective November 1, 1989) (sentencing discretion of 20 years to life). Respondent also cites to Kan.Stat.Ann. §§ 21–3421, 21–4501,

**15.** Aggravated kidnapping is the doing of any of the following acts with the intent thereby to force the victim, or some other person, to give up anything of apparent present or prospective value, or to grant any advantage or immunity, in order to secure a release of the person under the offender's actual or apparent control:

(1) The forcible seizing and carrying of any person from one place to another ...

Whoever commits the crime of aggravated kidnapping shall be punished by life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. La.R.S. § 14:44 (1986).

Simple kidnapping is:

(1) The intentional and forcible seizing and carrying of any person from one place to another without his consent; ...

Whoever commits the crime of simple kidnapping shall be fined not more than five thousand dollars, imprisoned with or without hard labor for not more than five years, or both. La.R.S. § 14:45 (1986).

**16.** S.D.Codified Laws § 24–15–4 (1979) ("A person sentenced to life imprisonment is not eligible for parole by the board of pardons and paroles.") was the statute involved in *Helm*.

22–3717 (Supp.1983) (life imprisonment with eligibility for parole after fifteen years).

The court has examined the above cited statutes. It appears that petitioner might have received a mandatory sentence of life imprisonment without parole in only one other state, Louisiana, depending on whether he was convicted of aggravated or simple kidnapping. In the other states which provide for the penalty of life imprisonment, either (1) its imposition is discretionary with either the jury or the sentencing judge, or (2) petitioner's conduct would not have qualified him for that sentence, or (3) the sentence is life with parole. The court finds that Iowa is the only state, with the possible exception of Louisiana, where petitioner would have received a mandatory life sentence without the possibility of parole. However, petitioner could have received a life sentence in several other states, in some states without parole.

Petitioner also argues that a sentence is disproportionate if it serves no acceptable social purpose. *See Rummel*, 445 U.S. at 293, 100 S.Ct. at 1149 (Powell, J., dissenting); *Coker v. Georgia*, 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977) (plurality opinion of White, J.) ("A punishment is 'excessive' and unconstitutional if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering …"). Petitioner argues that Iowa's sentencing scheme, which provides identical penalties for first degree kidnapping and first degree murder, provides no incentive for a kidnapper to refrain from murdering his victim. Respondent replies that the severe penalty provides a strong incentive for never committing the offense of kidnapping. While there may be some merit in petitioner's argument, the court finds that it is a policy argument rather than a constitutional argument.

█ Petitioner further argues that the vagueness of Iowa's kidnapping statute leads to "arbitrary and capricious" application of the "death penalty" because the jury must determine whether the confinement and removal involved is or is not incidental to a sexual abuse, and because the sentencing judge has no discretion whether or not to impose the penalty of life imprisonment without the possibility of parole if the jury finds first degree kidnapping. This court previously in this order rejected petitioner's argument that the Iowa kidnapping statute is unconstitutionally vague. The court does agree with petitioner that the mandatory nature of the penalty is relevant to determining whether the sentence is disproportionate. A mandatory penalty does not allow the sentencing judge or the jury in those states with jury sentencing to consider the facts and circumstances of the case when imposing punishment.

█ The court has also reviewed several cases which apply the principles of *Rummel* and *Helm* to life sentences. In *Terrebonne v. Butler*, 848 F.2d 500 (5th Cir.1988) (en banc), *cert. denied,* — U.S. ——, 109 S.Ct. 1140, 103 L.Ed.2d 201 (1989), the Fifth Circuit upheld a mandatory sentence of life imprisonment without parole imposed upon a heroin dealer. The *Terrebonne* court distinguished between *Rummel* and *Helm* on both the distinction between life with and life without parole and on the theory that a mandatory life sentence (as in *Rummel*) is imposed by the legislature, while a discretionary life sentence (as in *Helm*) is imposed by the judge. *Terrebonne*, 848 F.2d at 502. *Terrebonne* reasoned that *Rummel* stands for the proposition that if the penalty is chosen by the legislature, the legislature's judgment should not be questioned, but if the penalty is chosen by the judge, the judge's discretion may be questioned. *Id.* The court is unpersuaded by this reasoning. First, as previously discussed, *Helm* backed away from the position implied in *Rummel* that the legislature's sentencing scheme should receive absolute deference. *See Helm*, 463 U.S. at 288 n. 14, 103 S.Ct. at 3009 n. 14. Second, the court fails to see how a legislature allowing the sentencing judge discretion in choosing the appropriate penalty means that the legislature is not exercising a judgment which is entitled to deference. In this court's view, allowing the sentencing judge discretion furthers the proportionality purpose of the Eighth Amendment

by giving the sentencing judge a greater ability to make the punishment fit the crime. This court finds that the standard that it must apply regarding deference to the legislature is the one set forth in *Helm*.

Reviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals.

*Helm*, 463 U.S. at 290, 103 S.Ct. at 3009. The Fifth Circuit in *Terrebonne* applied the factors enumerated in *Helm* and concluded that Terrebonne's punishment was not severe. *Terrebonne*, 848 F.2d at 503–07. The Fifth Circuit distinguished *Helm* on the grounds that the offenses involved in *Helm* were characterized as minor, while heroin trafficking is not a minor offense. *Terrebonne*, 848 F.2d at 506–07. That same distinction applies to this case.

The Eleventh Circuit, in *Seritt v. State*, 731 F.2d 728 (11th Cir.), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 433 (1984), upheld a life sentence without the possibility of parole under the Alabama Habitual Offenders Statute following a conviction for first-degree armed robbery. Seritt had three prior felony convictions for drug offenses. The court found that neither *Rummel* nor *Helm* was precisely on point and, after applying the *Helm* factors, held "that under the facts in this case, the eighth amendment does not proscribe a sentence of life imprisonment without parole for a three-time convicted felon who thereafter commits a violent, life-threatening felony." *Seritt*, 731 F.2d at 737. The Eleventh Circuit followed *Seritt* in *Holley v. Smith*, 792 F.2d 1046 (11th Cir.1986), *cert. denied*, 481 U.S. 1020, 107 S.Ct. 1902, 95 L.Ed.2d 508 (1987) (Sentenced under Alabama Habitual Felony Offender Act after conviction for first degree robbery. Holley had at least seven prior felony convictions for grand larceny and second degree burglary.). Other cases have upheld life sentences against proportionality attacks. *See Edwards v. Butler*, 882 F.2d 160, 166–67 (5th Cir.1989) (life without parole for aggravated rape); *Williams v. Johnson*, 845 F.2d 906, 909–11 (11th Cir.

1988) (life with parole under Alabama Habitual Felony Offender Act); *Chandler v. Jones*, 813 F.2d 773, 778–80 (6th Cir.1987) (life with parole under Tennessee's Habitual Criminals Act).

The Eighth Circuit Court of Appeals has had several occasions to apply an Eighth Amendment proportionality analysis. Of note is *Helm v. Solem*, 684 F.2d 582 (8th Cir.1982), later affirmed by the Supreme Court. In *United States v. Lewis*, 759 F.2d 1316 (8th Cir.), *cert. denied*, 474 U.S. 994, 106 S.Ct. 406, 407, 88 L.Ed.2d 357 (1985), the court upheld the imposition (on defendant Milburn) of a discretionary sentence of life imprisonment without the possibility of parole for the offense of maintaining a continuing criminal enterprise in violation of 21 U.S.C. § 848(a)(1). *Lewis* distinguished *Helm* on the grounds that Milburn had organized and run a "continuing criminal enterprise over four years involve[ing] scores, if not hundreds, of felonies as he distributed marijuana and cocaine and as he used the telephone to facilitate the commission of these offenses. In addition, the record confirms that Milburn had three previous felony convictions for drug possession and sale." *Lewis*, 759 F.2d 1316. The Eighth Circuit, finding the sentence severe but constitutional, did "suggest that the district court may wish to reconsider the severity of the sentence under Fed.R. Crim.P. 35." *Id.* at 1335. Milburn acted upon this suggestion and, after the district court denied his Rule 35 motion, again appealed his sentence to the Eighth Circuit. *United States v. Milburn*, 836 F.2d 419 (8th Cir.), *cert. denied*, 487 U.S. 1222, 108 S.Ct. 2880, 101 L.Ed.2d 915 (1988). The Eighth Circuit again denied Milburn's Eighth Amendment claim.

In challenges to terms of years, the Eighth Circuit has declined to find such sentences disproportionate. *See Tyler v. Gunter*, 819 F.2d 869 (8th Cir.1987) (five year sentence for possession of ⅛th gram of hashish); *United States v. Eggleton*, 799 F.2d 378, 384–85 (8th Cir.1986) (45 year sentence for a kidnapping of four persons for several hours and bank robbery); *United States v. Wilson*, 787 F.2d 375, 382–84 (8th Cir.), *cert. denied*, 479 U.S. 857, 107

S.Ct. 197, 93 L.Ed.2d 129 (1986) (50 year sentence for kidnapping and bank robbery). In *Stevens v. Armontrout*, 787 F.2d 1282 (8th Cir.1986), the Eighth Circuit concluded that a jury-imposed 200 year sentence for second degree murder did not violate the Eighth Amendment. The court first noted that the 200 year sentence was not necessarily more severe than a life sentence. The Eighth Circuit found the sentence to be within the statutory maximum (any term of years) and stated that "[t]his case does not involve a minor crime, nor does it involve a situation in which parole is unavailable." *Id.* at 1284.

After having examined the Supreme Court's opinions in *Rummel* and *Helm,* and the case law interpreting these two decisions, the court finds that: (1) petitioner's crime is a very serious, violent crime against a person, and the mandatory penalty of life in prison without parole is very severe, (2) although petitioner's conduct is less egregious than the conduct required for conviction of all of the other Class "A" felonies and for some lesser felonies, petitioner's conduct is quite heinous, and the court finds that it must defer to the societal judgment of the Iowa legislature in equating kidnapping accompanied by sexual abuse with other Class "A" felonies; and (3) that although Iowa is the state, with the possible exception of Louisiana, which imposes the most severe penalty for petitioner's crime, the penalty in several other states comes close to this severe penalty. The deciding factor in this case is the fact that petitioner committed a violent felony, which was directed at a specific person. Petitioner's crime was not the nonviolent, property crime of uttering a "no account" check, which triggered the imposition of an impermissible life sentence without parole in *Helm.* Consequently, the court holds that petitioner's sentence is not disproportionate to the crime which he committed.

### Conclusion

The court holds that the Iowa first degree kidnapping statute, Iowa Code §§ 710.1, 710.2, is not unconstitutionally vague as applied to petitioner. The court further finds that petitioner's inculpatory statements were voluntarily made and that the statements would have been admissible for the purpose of impeachment if petitioner had taken the stand and denied the commission of the crime charged. Finally, the court holds that the punishment imposed upon petitioner, life imprisonment without the possibility of parole, does not violate the Eighth Amendment to the Constitution of the United States.

### ORDER:

Accordingly, It Is Ordered:

Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, filed May 2, 1989, and amended September 29, 1989, is denied.

Done and Ordered.